# EXHIBIT 1

KeyCite Yellow Flag - Negative Treatment

Declined to Extend by Ryan Racing, LLC v. Gentilozzi, W.D.Mich., January 31, 2017

2008 WL 2312668
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

UNPUBLISHED
Court of Appeals of Michigan.

James DeWITT, Plaintiff-Appellant,
v.
SEALTEX COMPANY, INC., Lloyd
Koning, and Marla Koning, Defendants,
and
LS Mold, Inc., Sealtex Custom Molding,
L.L.C., Larry Koning, and David
Koning, Defendants-Appellees.
James DeWitt, Plaintiff-Appellee,
v.
Sealtex Company, Inc., LS Mold, Inc., Lloyd
Koning, and Marla Koning, Defendants,
and
Sealtex Custom Molding, L.L.C., Larry Koning,
and David Koning, Defendants-Appellants.
Gerald Pitcher and Doris
Pitcher, Plaintiffs-Appellees,
v.
Sealtex Company, Inc., LS Mold, Inc.,
Sealtex Custom Molding, L.L.C., Lloyd
Koning, and Marla Koning, Defendants,
and
Larry Koning and David
Koning, Defendants-Appellants.
James DeWitt, Plaintiff-Appellant,
v.
Sealtex Company, Inc., Sealtex Custom Molding,
L.L.C., Larry Koning, David Koning, Lloyd
Koning, and Marla Koning, Defendants,
and
LS Mold, Inc., Defendant-Appellee.

Docket Nos. 273387, 273390, 274255, 275931.
|

June 5, 2008.

**Synopsis**

**Background:** Four different actions were brought in a successor liability, alter ego, and fraudulent conveyance dispute in which unsecured creditors of insolvent corporation asserted various claims against the corporation, a purported successor corporation, and an affiliated limited liability company (LLC), as well as against individual officers and directors of the corporation. After consolidation of the actions for trial purposes, and following bench trial, the Circuit Court, Muskegon County, entered a judgment of no cause of action in favor a successor companies, entered judgment in favor of creditor and against the LLC on successor liability and alter ego claims but not remaining claims, and in favor of creditors, as against individual directors, on director liability and piercing the corporate veil claims. Appeals were brought.

**Holdings:** The Court of Appeals held that:

[1] creditor could not prevail on claim of successor liability in purely commercial context;

[2] creditor did not establish fraudulent conveyance as against successor;

[3] creditor could not prevail on civil conspiracy claim;

[4] officers of insolvent corporation did not owe fiduciary duty to the creditors not to prefer other creditors;

[5] insolvent corporation was not the LLC's alter ego;

[6] creditors did not justify piercing the corporate veil to hold LLC members liable for insolvent corporation's obligations;

[7] remand of award of offer of judgment sanctions to successor corporation was required.

Affirmed in part, and vacated and remanded in part.

**WESTLAW** © 2017 Thomson Reuters. No claim to original U.S. Government Works. 1

West Headnotes (18)

**[1]**    **Corporations and Business Organizations**
       Assumption of or Succession to
Transferor's Liabilities

Creditor of insolvent corporation could not
prevail on claim of successor liability as
against an alleged successor corporation,
which claim arose in a purely commercial
context and regarded creditor protection.

1 Cases that cite this headnote

**[2]**    **Corporations and Business Organizations**
       As to fraudulent or preferential transfers

Evidence was sufficient to support trial
court finding that unsecured creditor to
insolvent corporation, did not suffer damages
from the corporation's conveyance and
transfer of assets to a successor corporation,
and therefore, creditor could not prevail
on fraudulent conveyance claim against
successor; the value that the insolvent
corporation received was close to market
value, and the value of its assets was
insufficient to pay its secured obligations, such
that unsecured creditor would not have been
paid.

Cases that cite this headnote

**[3]**    **Conspiracy**
       Nature and Elements in General

Creditor to insolvent corporation could not
prevail on claim of civil conspiracy as against
a successor corporation, absent an underlying
cause of action concerning a criminal or
unlawful purpose.

Cases that cite this headnote

**[4]**    **Appeal and Error**
       Insufficient discussion of objections

Creditor of insolvent corporation abandoned
for appellate review his claim that
underlying conduct of individual officers in

breaching fiduciary duties was sufficient to
support conspiracy claim against successor
corporation, where creditor failed to cite
on appeal any cases involving conspiracy to
breach fiduciary duties.

Cases that cite this headnote

**[5]**    **Appeal and Error**
       Insufficient discussion of objections

Creditor of insolvent corporation abandoned
for appellate review his claim that trial
court erred by releasing some but not all
of the documents that defendants claimed
were privileged in fraudulent conveyance suit,
where creditor failed to cite any supporting
authority on appeal.

Cases that cite this headnote

**[6]**    **Appeal and Error**
       Defects, objections, and amendments

Even if he had not abandoned the issue
on appeal, creditor of insolvent corporation
could not establish that trial court erred by
releasing some but not all of the documents
which defendants claimed were privileged in
fraudulent conveyance suit, absent evidence
or explanation as to how he was harmed by
the admission of certain allegedly privileged
documents, or how, if all documents been
released to him before trial, the trial court
would have arrived at a different verdict in
bench trial.

Cases that cite this headnote

**[7]**    **Appeal and Error**
       Insufficient discussion of objections

Creditor of insolvent corporation abandoned
for appellate review his claim that trial court
erred by allowing defendants' expert to testify
on all issues in fraudulent conveyance suit,
despite a prior order in limine limiting the
testimony, where creditor failed to cite any
supporting authority on appeal.

Cases that cite this headnote

15-41307-mlo    Doc 479-1    Filed 05/05/17    Entered 05/05/17 14:25:39    Page 3 of 19

**[8]** **Appeal and Error**
— Opinions and conclusions

Even if he had not abandoned the issue on appeal, creditor could not establish that trial court erred by allowing defendants' expert to testify on all issues in fraudulent conveyance suit, despite a prior order in limine limiting the testimony, absent discernible prejudice to creditor.

Cases that cite this headnote

**[9]** **Corporations and Business Organizations**
— As to fraudulent or preferential transfers

Creditor of insolvent corporation was not entitled to exemplary damages on claims of fraudulent transfer, director liability, or successor liability, which claims could be remedied by compensation.

Cases that cite this headnote

**[10]** **Fraud**
— Fiduciary or confidential relations

Officers of debtor corporation did not owe a fiduciary duty to certain unsecured creditors not to prefer other creditors, and thus, did not breach a fiduciary duty by selling corporate assets for fair value to pay corporation's secured creditor. M.C.L.A. §§ 450.183(4)(a), 450.1541a,.

1 Cases that cite this headnote

**[11]** **Fraud**
— Fiduciary or confidential relations

Plaintiffs' complaints, which, in addition to referring to three statutory sections, stated that defendants owed a "fiduciary duty of good faith and fair dealing," sufficiently stated a common law claim for breach of fiduciary duty. MCR 2.111.

Cases that cite this headnote

**[12]** **Bankruptcy**
— Co-debtors and third persons

Automatic stay of suits against debtor, which was issued in bankruptcy proceedings, did not bar proceedings against solvent co-defendants of the debtor.

Cases that cite this headnote

**[13]** **Corporations and Business Organizations**
— Insolvency, bankruptcy, and receivership

There was no legal relationship between insolvent corporation and a limited liability company (LLC) as would permit a finding that the corporation was the LLC's alter ego, so as to enable unsecured creditors of the insolvent corporation to attach liability to the LLC; although the LLC had two members, and such members were also two of the three shareholders of the corporation, the LLC did not control or have any other relationship with the corporation.

Cases that cite this headnote

**[14]** **Corporations and Business Organizations**
— Fraud

Limited liability company (LLC), which had as its two members two of three shareholders of insolvent corporation, did not use the corporation to commit a fraud, as was required to permit corporation's unsecured creditors to recover on claim that the corporation was the LLC's alter ego, and to thereby attach liability to the LLC; the creditors' losses were caused by the corporation's economic collapse, and were not due to a relationship between the corporation and the LLC.

Cases that cite this headnote

**[15]** **Appeal and Error**
— Insufficient discussion of objections

Creditors of insolvent corporation abandoned for appellate review their claim that trial court erred by failing to pierce the corporate veil of a limited liability company (LLC), which had as its members two of the three shareholders in the insolvent corporation, in order to hold the

15-41307-mlo    Doc 479-1    Filed 05/05/17    Entered 05/05/17 14:25:39    Page 4 of 19

members personally liable for the obligations of the insolvent corporation, where creditors failed to provide support for their position on appeal.

Cases that cite this headnote

[16] **Corporations and Business Organizations**
     Particular occasions for determining entity

Even if the issue had not been abandoned on appeal, creditors of insolvent corporation could not establish that trial court erred by failing to pierce the corporate veil of a limited liability company (LLC), which had as its members two of the three shareholders in the insolvent corporation, in order to hold the members personally liable for the obligations of the insolvent corporation, absent proof that the LLC was liable to the creditors or that the LLC was the mere instrumentality of the members.

Cases that cite this headnote

[17] **Appeal and Error**
     Ordering New Trial, and Directing Further Proceedings in Lower Court

Remand of trial court's award of offer of judgment sanctions to successor corporation, in successor liability and fraudulent conveyance case brought by creditor of insolvent predecessor, which award was arrived at by reducing attorney fees that successor requested by 20%, was required in order to reduce the award further, or to eliminate all sanctions, apart from the successor's expert's costs, where creditor's claims against successor involved unsettled case law, and the legal fees for all defendants in the case were charged to the successor corporation so as to be made subject to the award. MCR 2.405(D)(1), 2.405(D)(3).

1 Cases that cite this headnote

[18] **Costs**

     Recovery less favorable than tender or offer
**Costs**
     Experts

Trial court acted within its discretion by awarding, as part of offer of judgment sanctions to successor corporation, 80% of the costs for expert witness who testified on behalf of the successor corporation but also on behalf of other defendants in action by creditor of insolvent predecessor corporation, where the expert's testimony was applicable to the successor's defense. MCR 2.405(D)(1).

Cases that cite this headnote

Muskegon Circuit Court; LC Nos. 03-042586-CK, 04-043430-CK.

Before: O'CONNELL, P.J., and HOEKSTRA and SMOLENSKI, JJ.

**Opinion**

PER CURIAM.

**\*1** In these consolidated cases, plaintiff James DeWitt appeals as of right from the trial court's judgment of no cause of action entered in favor of defendant LS Mold on the counts of successor liability, alter ego/piercing corporate veil, fraudulent conveyance and civil conspiracy (Docket No. 273387). In Docket Nos. 273390 and 274255, defendants Larry and David Koning appeal the trial court's holding them personally liable under piercing the corporate veil and director liability/breach of fiduciary duty theories to plaintiff DeWitt and plaintiffs Pitcher, and holding Sealtex Custom Molding (SCM) liable for Sealtex Company's debt under the successor liability doctrine. The trial court entered final judgment in DeWitt's favor in the amount of $195,081.97 and in the Pitchers' favor in the amount of $346,396.01.

In Docket No. 275931, plaintiff DeWitt appeals the trial court's award of $255,749.52 in offer of judgment sanctions to LS Mold, including costs awarded LS Mold for defendants' expert, Professor Elliot Spoon.

We affirm in Docket No. 273387. In Docket Nos. 273390 and 274255, we vacate the judgments entered in plaintiffs' favor. In Docket No. 275931, we affirm the award of costs

WESTLAW  © 2017 Thomson Reuters. No claim to original U.S. Government Works.    4

for defendants' expert, but otherwise vacate the award of offer of judgment sanctions and remand to the trial court.

The facts are set forth in the trial court's lengthy opinion, which followed a bench trial, and will not be repeated here.

Plaintiff DeWitt filed suit against Sealtex on August 25, 2003, and amended his complaint to add LS Mold as a defendant on September 29, 2003. Through additional amended complaints, plaintiff added SCM and the four individual Konings as defendants. Through the offer of judgment process, DeWitt's claims against Lloyd and Marla Koning were settled before trial. Sealtex defaulted and judgment was entered against it.

Plaintiffs Gerald and Doris Pitcher, the parents of Sealtex employee Mike Pitcher (who later, with defendants Koning, purchased Sealtex from DeWitt and served as its president), filed suit against all defendants in October 2004. Sealtex defaulted and judgment was entered against it. Through case evaluation, judgments of no cause of action were entered in favor of SCM, LS Mold, and Lloyd and Marla Koning. Plaintiffs Pitcher proceeded to trial against Larry and David Koning only.

The trial court consolidated the cases for trial purposes. Following a 12-day bench trial, the court found:

- LS Mold-Judgment of no cause of action as to all counts in DeWitt and Pitcher cases

- SCM-Judgment in DeWitt's favor on successor liability and alter ego counts; no cause of action as to all DeWitt's remaining counts

- Larry and David Koning-Judgment in favor of DeWitt and the Pitchers on director liability and piercing the corporate veil; no cause of action as to all remaining counts

These appeals ensued.

*Docket No. 273387*

**[1]** Plaintiff DeWitt asserts that the trial court erred in finding that LS Mold did not have successor liability. We disagree.

**\*2** We review de novo the application of successor liability doctrine because it is derived from equitable principles. *Craig v. Oakwood Hosp.,* 471 Mich. 67, 77, 684 N.W.2d 296 (2004).

The traditional rule of successor liability examines the nature of the transaction between predecessor and successor corporations. If the acquisition is accomplished by merger, with shares of stock serving as consideration, the successor generally assumes all its predecessor's liabilities. However, where the purchase is accomplished by an exchange of cash for assets, the successor is not liable for its predecessor's liabilities unless one of five narrow exceptions applies. The five exceptions are as follows:

(1) where there is an express or implied assumption of liability; (2) where the transaction amounts to a consolidation or merger; (3) where the transaction was fraudulent; (4) where some of the elements of a purchase in good faith were lacking, or where the transfer was without consideration and the creditors of the transferor were not provided for; or (5) where the transferee corporation was a mere continuation or reincarnation of the old corporation.

[*Foster v. Cone-Blanchard Machine Co.,* 460 Mich. 696, 702-703, 597 N.W.2d 506 (1999) (internal quotes and citations omitted) .]

In the seminal case of *Turner v. Bituminous Casualty Co.,* 397 Mich. 406, 244 N.W.2d 873 (1976), a products liability case, the plaintiff was injured using a press manufactured and sold by a corporation that had been dissolved several years earlier. *Id.* at 411, 244 N.W.2d 873. The name, good will and assets of the manufacturing corporation had been sold in a cash sale, however, and the plaintiff sued the new company in tort seeking recovery for the injury. *Id.* at 411-412, 244 N.W.2d 873. The purchasing corporation "defended on the basis that it was a corporate stranger to the manufacturer and hence not liable." *Id.* at 411, 244 N.W.2d 873. The Supreme Court applied the doctrine of successor liability in this products liability case and reversed the circuit court's grant of summary disposition to the defendant (this Court had denied leave to appeal), noting:

Products liability law is a fast-developing area. All the rules have not yet been formulated and products liability law, as it matures has to shake off various impediments associated with traditional

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works. 5

concepts, which, while relevant to other problems, are inappropriate for this new area.

* * *

For the same reasons, defendants' reliance on the so-called "general rule of non-liability" whereby, with certain limited exceptions, the purchasing corporation is not liable for obligations of the transferor corporation, is inapposite. That rule developed not in response to products liability problems, *but largely in the areas of creditors' protection,* and of tax assessments, or, in the case of the de facto merger, in the context of shareholder rights. [*Id.* at 417-418, 244 N.W.2d 873 (citations omitted; emphasis added).]

After *Turner, supra,* and *Foster v. Cone Blanchard Machine Co.,* 460 Mich. 696, 597 N.W.2d 506 (1999), both products liability cases, the Supreme Court revisited the successor liability doctrine in *Craig, supra,* a medical malpractice case. The *Craig* Court reversed this Court's affirmance of the trial court's finding of successor liability, noting:

**\*3** We recently described the scope of successor liability in *Foster v. Cone Blanchard Machine Co.* There, we observed the "traditional rule" that successor liability requires an examination of "the nature of the transaction between predecessor and successor corporations." In a merger in which stock is exchanged as consideration, the successor corporation "generally assumes all its predecessor's liabilities." When the successor purchases assets for cash, however, the successor corporation assumes its predecessor's liabilities *only*

(1) where there is an express or implied assumption of liability; (2) where the transaction amounts to a consolidation or merger; (3) where the transaction was fraudulent; (4) where some of the elements of a purchase in good faith were lacking, or where the transfer was without consideration and the creditors of the transferor were not provided for; or (5) where the transferee corporation was a mere continuation or reincarnation of the old corporation. [*Id.* at 96-97, 684 N.W.2d 296.]

The *Craig* Court noted "we have never applied successor liability in the medical malpractice context," went on to apply the *Turner/Foster* requirements, and concluded that the plaintiff "has adduced no reason why we should do

so [apply successor liability in the medical malpractice context] in this case":

Not only are the *Turner/Foster* requirements not met here but, more important, the policies that justify the imposition of successor liability are noticeably inapplicable here. We stated in *Foster* that

[t]he thrust of the decision in *Turner* was to provide a remedy to an injured plaintiff in those cases in which the first corporation "legally and/or practically becomes defunct." ... The underlying rationale for the *Turner* Court's decision to disregard traditional corporate law principles was to provide a source of recovery for injured plaintiffs.

Here, plaintiff has already sought and obtained a judgment from Drs. Gennaoui and Kittur, from Associated Physicians, P.C., and from Oakwood Hospital. Because plaintiff obtained a judgment against other sources, there was no need to impose successor liability on Henry Ford, even if the *Turner/Foster* factors had justified such liability. The trial court erred in imposing successor liability on Henry Ford and the Court of Appeals erroneously affirmed this ruling. [*Id.* at 99, 684 N.W.2d 296.]

The trial court in the instant case concluded that *Craig, supra,* left open the possibility that the successor liability doctrine could apply in a purely commercial context such as the instant case. [1] We do not disagree. However, during the pendency of this case this issue was resolved by the Michigan Supreme Court in *Starks v. Michigan Welding Specialists, Inc.,* 477 Mich. 922, 722 N.W.2d 888 (2006). In *Starks,* the Court heard oral argument on the application for leave to appeal and in lieu of granting leave, affirmed this Court's judgment, [2] stating:

**\*4** Where, as here, a successor corporation acquires the assets of a predecessor corporation and does not explicitly assume the liabilities of the predecessor, the traditional rule of corporate successor non-liability applies. See *Foster[, supra* at 702, 597 N.W.2d 506]. Because an exception designed to protect injured victims of defective products rests upon policy reasons not applicable to a judgment creditor, the Court declines to expand the exception to the traditional rule set forth in *Turner[, supra],* to cases in which the plaintiff is a judgment creditor. *[Id.]*

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works. 6

We agree with defendants that *Starks* makes clear that the Supreme Court will not apply the doctrine of successor liability in a purely commercial context. Accordingly, we affirm the trial court's rejection of plaintiff's successor liability claim as to LS Mold.

 **[2]**    Plaintiff DeWitt also contends that the trial court erred in finding that LS Mold was not liable for its participation in a fraudulent transfer. We disagree.

Questions regarding statutory interpretation and application are issues of law this Court reviews de novo. *Yaldo v. North Pointe Ins. Co.,* 457 Mich. 341, 344, 578 N.W.2d 274 (1998). The trial court applied MCL 566.34 of the Uniform Fraudulent Transfers Act (UFTA), MCL 566.31 *et seq.,* to plaintiff's claim. MCL 566.34 provides in pertinent part:

> Sec. 4. (1) A transfer made or obligation by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation in either of the following:
>
> * * *
>
> (b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor did either of the following:
>
>> (i) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction.
>>
>> (ii) Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

In the instant case, the trial court entered judgment in favor of all defendants of no cause of action:

> Plaintiffs' fraudulent conveyance count does not specify any statute upon which it is based. The court analyzes it under the statute discussed in the trial, the Michigan version of the Uniform Fraudulent Conveyance Act, MCL 566.1 *et seq.* To some extent, this is the latest situation where the court must confine its analysis to the specific theory presented. It is not enough for the court to simply conclude "something isn't right here" and enter a judgment in that amount[.]

Thornhill [plaintiffs' expert] said this transaction had several "badges of fraud" as identified at MCL 566.34. The transfer was to an insider, as the brothers Koning were controlling shareholders in all three corporations: Sealtex 1, LS Mold, and Sealtex Custom Moldings. The transfer was of substantially all of the debtor's assets. The debtor was either insolvent or became insolvent shortly after the transfer was made.

 **\*5**  On the other hand, then, as Professor Spoon says, if fair value is received, none of these things matter. Thornhill agreed, to some extent, in a particularly contentious bit of testimony. To use yet another of the various examples the court used during the trial, if I receive fair value when I sell my car, I probably don't care too much whether the buyer had various conflicts of interest.

The key question is identifying the value of Sealtex 1 at the time of the sale in 2003. This is no easy effort. This judge once thought this task lent itself to a nice chart comparing the different estimates, but it is exceedingly difficult to compare the proverbial "apples and oranges."

**Equipment.** No one was qualified to, or seriously disputed, Terry Podgorski's estimate of $306,650.00 (exhibit 120) as the fair market value of "certain machinery and equipment" as of June 10, 2003....

**Total assets.** Defendant's expert, Paul Taylor, evaluating all the assets and liabilities, calculated the total assets of Sealtex as $575,000 as of September 30, 2003, and $477,000 for the Article 9 assets alone. Swick estimated total corporate value at $1,020,000, but in a casual and incomplete way that leads the court to discount his testimony.

Hoekstra, in a November 11, 2003, memo about the tax basis (exhibit 63), pegged the fair market value of the acquired assets at $585,570.52. However, the SCM balance sheet of October 31, 2003 (exhibit 90) showed assets of $856,795.20 over liabilities of approximately $819,000. RSM Equico (exhibit 95) estimated the fair market value of LSM at $2.2 million. The title page indicates that it is considering both LSM and ST1, but then it uses only the noun LSM in the balance of the

WESTLAW  © 2017 Thomson Reuters. No claim to original U.S. Government Works.  7

92 page report. It apparently did not believe that ST1 brought much value.

It is important to not lose sight of the "trees" because of the "forest" presented in all these reports. It is especially useful to consider the situation as viewed by those either financially invested or either completely disinterested.

Everyone agrees ST1 was in severe distress. Merely paying the bills does not conceal that fact. The bank was worried about its loan and the amount owed was about $565,000. It required security from others. If corporate value exceeded $1 million, as Swick suggested, the bank likely would not have been concerned. RSM Equico, a disinterested third party, treated ST1 as unimportant in its financial assessment.

Swick himself, even after offering these glowing numbers, was ambivalent (at best) about the wisdom of a client of his making this purchase. Taylor, more thorough, supports the value actually paid. Podgorski's numbers have not been challenged, and grafting even Swick's estimate of receivables and goodwill to that leaves a figure not far from that paid.

The court believes the price, even though a note, paid was close to the fair market value of ST1. Judgment of no cause for action enters on this count.

**\*6** Thornhill is right in many respects. There are several badges of fraud here, but the value obtained means, among other things, that there are no damages. In the end, despite plaintiffs' palpable exasperation with shortcomings in the procedures in the Article 9 sale, the outcome is a demurrer.

Plaintiff challenges the trial court's ruling as to LS Mold only. We agree with defendants that the relevant inquiry under MCL 566.34 is whether the debtor (here, Sealtex/ST1, not LS Mold) received "reasonably equivalent value." The trial court's analysis properly identified Sealtex/ST1 as the debtor. Sealtex/ST1 received a $565,000 credit on the debt it owed under the Fifth Third loan documents as a result of the Article 9 sale. Plaintiff does not argue that the Article 9 sale was unlawful, nor did the proofs at trial support such a conclusion.

The trial court found, based on the experts' testimony, that the value Sealtex/ST1 received was close to market value. In addition, the evidence was that the value of Sealtex/ST1's assets was insufficient to pay its secured obligations, thus the trial court properly found that plaintiff did not suffer damages from the transfer as he would not have been paid as an unsecured creditor. For these reasons, the trial court properly found that plaintiff's fraudulent conveyance claim as to LS Mold failed.

**[3]** Next, plaintiff DeWitt asserts that the trial court erred in exonerating LS Mold for its participation in a civil conspiracy. We disagree.

We review de novo a trial court's conclusions of law in a bench trial. *Harbor Park Market, Inc. v. Gronda,* 277 Mich.App. 126, 130, 743 N.W.2d 585 (2007). "A civil conspiracy is a combination of two or more persons, by some concerted action, to accomplish a criminal or unlawful purpose, or to accomplish a purpose not unlawful by criminal or unlawful means." *Advocacy Org. v. Auto Club Ins. Ass'n.,* 257 Mich.App. 365, 384, 670 N.W.2d 569 (2003). It is necessary to prove a separate, actionable tort to maintain a civil conspiracy claim. *Id.*

The trial court entered a judgment of no cause of action in LS Mold's favor on the civil conspiracy count, noting:

> There is no question but that ST1 had fallen on financial hard times, but it is silly to claim that the Koning brothers orchestrated two years' bad performance to set up a plan to eliminate the debts owed to these plaintiffs. The court has earlier found that they bear personal liability in some respects. The only other evidence of any fraudulent or sinister motive lies in some theory that the plan was created to remedy Larry Koning's admission that he and his brother overpaid DeWitt for ST1 in the first place.

> Reduction of corporate debt is a perfectly laudable purpose. Persons who successfully do this and accomplish corporate improvements are hailed as heroes in the business world. Thus, any conspiracy claim must rest on the second definition, accomplishing a purpose not unlawful, but by using criminal or unlawful means.

> **\*7** The method selected, the Article 9 sale, was perfectly valid and lawful. The way in which this plan was effected was deficient in some respects, as noted previously in this opinion, but does not prove a conspiracy.

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.    8

The court has already found that the term "squeeze-out" has little application to persons who are only creditors of the corporation. When done correctly, corporations can continue in business and have their debts eliminated. That is the primary scheme to which the Koning brothers allegedly conspired. It does not have the requisite wrongfulness for the court to find that they have engaged in a civil conspiracy. To the extent that they breached their fiduciary duties, there is no conspiracy proven here, to do that, either, even if that states a cause of action. Judgment of no cause for action will enter on this count.

**[4]** The gist of plaintiff's argument appears to be that because the trial court concluded that the Koning brothers breached their fiduciary duty, it should have concluded that defendants Koning, as directors of LSM, *conspired to* breach their fiduciary duty. Because plaintiff cites no cases involving conspiracy to breach fiduciary duties, we deem this issue abandoned. *In re Application of Ind. Mich. Power Co.,* 275 Mich.App. 369, 376, 738 N.W.2d 289 (2007). Additionally, since we conclude below that plaintiffs' breach of fiduciary duty claim fails, this issue is moot because there is no underlying cause of action supporting the conspiracy claim. *Advocacy Org., supra.*

Finally, we note that the trial court's opinion, quoted *supra,* makes clear that it concluded that defendants' goal was to continue in business with debt eliminated, and that defendants effected that goal through an Article 9 sale. Plaintiff does not argue nor has he shown that the Article 9 sale was criminal or unlawful. *Id.* Thus, plaintiff has not established grounds for setting aside the trial court's entry of judgment of no cause of action in LSM's favor on plaintiff's civil conspiracy count.

**[5]** Plaintiff DeWitt maintains that the trial court erred by releasing some but not all of the documents that defendants claimed were privileged. We disagree.

We review de novo whether the attorney-client privilege applies to a communication. *Leibel v. General Motors Corp.,* 250 Mich.App. 229, 236, 646 N.W.2d 179 (2002). The only authority plaintiff cites under this issue is *Leibel, supra,* regarding the applicable standard of review, and *McCarthy v. Belcher,* 128 Mich.App. 344, 348, 340 N.W.2d 848 (1983), for the general proposition that the attorney-client privilege is waived as to a confidential communication when the client testifies concerning the contents of a privileged communication. Having provided only cursory treatment with no supporting authority, plaintiff has abandoned this issue. *In re Application of Ind. Mich. Power Co., supra.*

**[6]** Even if the issue were preserved, we would find no error. The trial court reviewed the documents in camera, and released some, but not all, to plaintiff, noting that "not every communication about these events can be considered to be in furtherance of fraud." Plaintiff does not acknowledge this. More fundamental, however, is that plaintiff does not argue or explain what harm he suffered by the trial court's failure to release some of the documents. Plaintiff's appellate brief notes that the documents the trial court **did release** discussed how to eliminate defendants' debt to DeWitt and avoid legal liability and confirmed defendants' attempt to fraudulently transfer ST1's assets to a new entity owned and operated by the Koning brothers while avoiding the debt to DeWitt, i .e., supported his case. "[A] preserved nonconstitutional error is not a ground for reversal unless 'after an examination of the whole cause, it shall affirmatively appear' that it is more probable than not that the error was outcome determinative." *People v. Lukity,* 460 Mich. 484, 495-496, 596 N.W.2d 607 (1999); see also *Barnett v. Hidalgo,* 478 Mich. 151, 172, 732 N.W.2d 472 (2007). Given that plaintiff does not explain how he was harmed by the trial court's admission of some of the allegedly privileged documents, or argue that had all the documents been released to him before trial the judge in this bench trial would have arrived at a different verdict, we conclude that plaintiff has not established that it is more probable than not that the error, if any, was outcome determinative. *Lukity, supra; Hidalgo, supra.*

**\*8 [7]** Plaintiff also contends that the trial court erred by allowing defendants' expert to testify on all issues, despite a prior order in limine limiting the testimony to alter-ego and veil piercing. Because plaintiff cites no authority, he has abandoned this issue. *Peterson Novelties, Inc. v. City of Berkley,* 259 Mich.App. 1, 14, 672 N.W.2d 351 (2003).

**[8]** Even if the issue were preserved, we would find no error. The trial court's October 3, 2005 order granting plaintiff's motion for leave to file amended pleadings authorized defendants to name up to four additional witnesses for the purpose of rebutting plaintiff's added counts of alter ego and piercing the corporate veil. Plaintiff was permitted to depose defendants' added

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

witness, Professor Spoon, only regarding his opinions on the added counts. Defendants offered Spoon as an expert witness in the areas of piercing the corporate veil, alter ego, successor liability, fraudulent conveyance, director duties and Michigan's Business Corporations Act. The trial court overruled plaintiff's objection to the expanded testimony.

However, as defendants assert (and plaintiff does not mention), the trial court stated on the record the reasons it allowed Spoon's expanded testimony, which included that plaintiff's expert, Thornhill, had expanded his testimony:

> [I]f I look at the whole scope of things, if I look at the way that Thornhill's testimony frankly expanded a bit as it went along; as I look at the way I allowed it to expand and the testimony evolve and as I remember at one point when I specifically invited Mr. Rynbrandt and Mr. Phelps to see if Professor Spoon could stretch out maybe to cover these things as opposed to delaying the trial and adding some additional folks. I'm not seeing discernible prejudice to the plaintiff's team by allowing him to testify on all these areas.

For these reasons, plaintiff has not shown that the trial court abused its discretion by allowing Spoon to testify regarding issues not enumerated in the October 2005 order. *Tate v. Detroit Receiving Hosp.,* 249 Mich.App. 212, 215, 642 N.W.2d 346 (2002).

 **[9]**   Plaintiff DeWitt contends that the trial court erred by refusing to award exemplary damages. We disagree.

An award of exemplary damages is only appropriate where it compensates a plaintiff for the humiliation, outrage, and indignity that stems from malicious and willful conduct by a defendant. *B & B Investment Group v. Gitler,* 229 Mich.App. 1, 9-10, 581 N.W.2d 17 (1998). In *Hayes-Albion Corp. v. Kuberski,* 421 Mich. 170, 187, 364 N.W.2d 609 (1984), the Supreme Court stated:

> Since *Ross v. Leggett,* 61 Mich. 445, 28 N.W. 695 (1886), the purpose of exemplary damages in Michigan has not been to punish the defendant,

but to render the plaintiff whole. When compensatory damages can make the injured party whole, this Court has denied exemplary damages. *Veselenak v. Smith,* 414 Mich. 567, 327 N.W.2d 261 (1982).

As explained in *Veselenak,* exemplary damages are allowed for compensation for injury to feelings, are generally awarded in intentional tort contexts, and are justified only when the defendant's conduct is "malicious or so willful and wanton that it demonstrates a reckless disregard for plaintiff's rights." 414 Mich. at 574-575, 327 N.W.2d 261. Exemplary damages are not granted to compensate a purely pecuniary grievance that can be remedied by full and definite monetary compensation. *Hayes-Albion, supra* at 187, 364 N.W.2d 609. "It is not essential to present direct evidence of an injury to the plaintiff's feelings. Rather, the question is whether the injury to feelings and mental suffering are natural and proximate in view of the nature of the defendant's conduct." *McPeak v. McPeak,* 233 Mich.App. 483, 490, 593 N.W.2d 180 (1999).

 **\*9**  We have found no Michigan case in which the court awarded exemplary damages for fraudulent transfer, director liability, or successor liability claims. In any event, where a strictly pecuniary grievance such as the instant one to recover an unsecured debt can be remedied by compensation, exemplary damages are inappropriate. *Hayes-Albion, supra; Veselenak, supra.*

*Docket Nos. 273390 & 274255*

 **[10]**   Defendants Koning assert that the trial court erred by holding that they owed plaintiffs a fiduciary duty and by holding that they breached that duty by selling Sealtex's assets for fair value to pay Sealtex's secured creditor. We agree. We review a trial court's factual findings for clear error and its legal conclusions de novo. *Harbor Park Market, Inc., supra.*

 **[11]**   Preliminarily, we disagree with defendants that plaintiffs pleaded only statutory claims and not a common law claim of breach of fiduciary duty, and that this Court should therefore reverse the trial court on this count. Plaintiffs' complaints, in addition to referring to three statutory sections, stated that defendants Koning owed Sealtex and its creditors a "fiduciary duty of good faith and fair dealing." We deem this sufficient to state

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works. 10

a common law claim for breach of fiduciary duty. See MCR 2.111; Dean & Longhofer, Michigan Court Rules Practice, § 2111.3, p 229 (a complaint must "give notice of the nature of the claim at least sufficient to permit the preparation of a meaningful response."). [3]

We disagree with plaintiffs that defendants' own expert, Nawrocki, testified that defendants owed plaintiffs a fiduciary duty. Nawrocki, a certified public accountant, testified that it was his understanding that when a corporation is in the zone of insolvency, it becomes responsible to the creditors, not the shareholders, and that "you have to be aware of that fiduciary responsibility." Nawrocki testified that he is not a lawyer, but an accountant, and that he was not a legal expert and did not intend to give a legal opinion. Thus, Nawrocki's testimony was not as a legal expert.

"As a general rule, corporate officers and directors owe corporate creditors no extracontractual duties, absent special circumstances such as corporate insolvency, fraud or violation of a statute." 3A Fletcher Cyclopedia Corporations, § 1035.60, p 30.

> In most jurisdictions, when a corporation becomes insolvent, officers and directors of a corporation owe a fiduciary duty to the corporation's creditors. [*Id.* pp 30-31, 743 N.W.2d 585.]

However, Michigan follows the minority rule, not the rule stated above. In *Bank of Montreal v. J E Potts Salt & Lumber Co.,* 90 Mich. 345, 51 N.W. 512 (1892), the Supreme Court refused to hold assignments made by an insolvent corporation illegal, noting:

> In *Turnbull v. Lumber Co.*[, 55 Mich. 387, 21 N.W. 375 (1884),] it appeared that the corporation was converting its assets into money as rapidly as possible, and paying only certain of the creditors. The corporation was at the same time insolvent. Speaking of these acts of the corporation, Mr. Justice Champlin said:
>
> > **\*10** "It being insolvent, such action must result in the payment of some to the exclusion of others. Such conduct, * * * although legal and proper before a bill is filed against it by a judgment creditor

whose execution is returned unsatisfied, becomes improper after the filing of such bill. From that time on, no unsecured creditor is entitled to a preference over others."

In the case of *Hills v. Furniture Co.,* 23 Fed Rep. 434, a mortgage had been given by an insolvent corporation to secure certain creditors. It was said:

> "It does not affect the question if the company would never pay its debts in full, for the legal right of an insolvent debtor to secure one or more creditors, in preference to others, where no fraud is intended, is settled in Michigan by many decisions."

2. Nor is it the law of this State that, as soon as a corporation becomes insolvent, the directors of the corporation become trustees for all the creditors alike, in such sense as to prevent their giving valid security by preference to one of the stockholders or directors.....

\* \* \*

The rule in this State has, we think been established since the case of *Town v. Bank,* 2 Doug. 530, that a corporation may, in the absence of legislative restriction, deal with its property precisely as an individual may, and may prefer one creditor over another; and hence that the assets do not become a trust fund, for *pro rata* distribution among all its creditors, until such time as steps are taken under the "Winding Up Act," chapter 282, How. Stat. [*Id.* at 349-350.]

See also *Anno: Right of corporation to prefer creditors,* 19 ALR 320, which notes that Michigan follows the view that preference may be given to one general creditor over others by an insolvent corporation, in the absence of a statutory prohibition, citing *Bank of Montreal, supra; Turnbull, supra* (discussed in *Bank of Montreal* ), and *Haight v. Smith,* 178 Mich. 392, 398, 144 N.W.2d 830 (1914) (noting "it is not the law of this state that as soon as a corporation becomes insolvent its directors become trustees for all of its creditors alike."). Section 834 of the Michigan Business Corporation Act, MCL 450.183(4)(a), provides that "the directors of the

corporation are not deemed to be trustees of its assets and shall be held to no greater standard of conduct than that prescribed by section 541 a." [4]

Defendants argue that the trial court ignored Michigan law and improperly relied on Delaware cases. Plaintiffs do not distinguish the Michigan cases the trial court relied on from the cases defendants rely on, discussed *supra,* nor do defendants.

The trial court cited *Grand Rapids Trust Co. v. Nichols,* 199 Mich. 126, 165 N.W. 667 (1917), and *Barden v. A Heller Sawdust Co.,* 240 Mich. 549, 215 N.W. 364 (1927). *Grand Rapids Trust Co., supra,* was a trustee in bankruptcy's suit, brought after the 1910 amendment to federal bankruptcy law under which trustee's rights were "materially enlarged" [5] to include "the rights of a creditor 'armed with process'-all the rights of a judgment creditor holding an execution duly returned unsatisfied; in other words he had all the rights of a creditor who had taken all the steps preliminary to filing a creditor's bill." The trustee's bill alleged that a patent turned in by one Brackett, a "man of straw," in exchange for common stock, was of little or no value and a fraudulent attempt to evade statutory requirements. The bill sought an accounting and payment by the defendants for stock "up to the amount that may be necessary to liquidate the claims of those creditors who have extended credit on the faith of the capital stock of the corporation and who have been defrauded." *Id.* at 129, 165 N.W. 667. Although the *Grand Rapids Trust Co.* Court noted that "a creditor of a corporation whose claim has been reduced to judgment upon which execution has been issued and returned *nulla bona* may file a creditors' bill, if the facts justify it, is beyond question in this State," [6] and we presume that it is this proposition on which the trial court in the instant case was relying, we fail to see how this bankruptcy case involving fraud supports the trial court's conclusion in the instant case (in which the court entered judgment of no cause of action in defendants' favor on plaintiffs' fraudulent transfer claims) that defendants owed plaintiffs a fiduciary duty.

\* \* \*

\* \* \*

**\*11** *Barden, supra,* on which the trial court also relied, involved the issue of whether an insolvent corporation has the right to purchase its own corporate stock. Barden, Heller and Sherman incorporated the A. Heller Sawdust Company with capital stock of $10,000, all common, to which each subscribed for one-third and became directors. *Id.* at 551, 215 N.W. 364. Heller furnished $1,000; Barden and Sherman nothing. *Id.* Barden moved away and the company purchased his stock for $5,000 and released him from liability on his stock subscription. *Id.* The purchase price was made up of $3,000 cash borrowed from a bank and a note for $2,000 signed by the company and Heller and Sherman. *Id.* Barden brought suit on the note and a second suit on the subscription. *Id.* The Barden Court noted: "By this transaction plaintiff was relieved of his subscription amounting to $3,333.33, received $3,000 in cash and a note for $2,000 additional for the surrender of 33 # shares of stock in an insolvent corporation. He and his codirectors of the corporation had no authority under the law to make such a deal." *Id.* at 556, 215 N.W. 364.

The *Barden* Court noted the Michigan rule that "[a] corporation acting in good faith, without objection from stockholders and without prejudice to creditors, may purchase shares of its own stock, regardless of the purpose for which it was organized, unless forbidden by statute," as long as it is solvent. *Id.* at 553, 215 N.W. 364 (internal quotes and citation omitted). However, "[i]f the corporation is insolvent at the time of the purchase it is clearly an invalid transaction, and will be set aside. The rule goes still further, and declares that if a corporation, by a purchase of shares of its own capital stock, thereby reduces its actual assets below its capital stock and debts, or if the actual assets at that time are less than the capital stock and debts, such purchase may be set aside and the guilty corporate officers, as well as the vendor of the stock, may be rendered liable thereon at the instance of a corporate creditor." *Id.* at 553-554, 215 N.W. 364 (internal quotes and citation omitted). The instant case, unlike *Barden,* does not involve a corporation purchasing its own stock; thus, *Barden* is distinguishable.

We conclude that under the Michigan law, the trial court erred in holding that defendants Koning owed plaintiffs a fiduciary duty.

**[12]** Defendants also contend that the trial court erred by holding that SCM was the successor to, and alter ego of, Sealtex, and thus liable for Sealtex's contractual

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works. 12

obligations to plaintiffs. We agree. As discussed *supra,* during the pendency of this case our Supreme Court affirmed this Court's decision in *Starks,* and its order of affirmance, quoted *supra,* precludes successor liability claims in purely commercial settings such as this. [7]

**[13]** As to the alter ego claim, an alter ego is "[a] corporation used by an individual in conducting personal business, the result being that a court may impose liability on the individual by piercing the corporate veil when fraud has been perpetrated on some dealing with the corporation." Black's Law Dictionary (8th ed 2004).

> **\*12** A claim based on the alter ego theory is not in itself a claim for substantive relief, but rather is procedural. A finding of fact of alter ego, standing alone, creates no cause of action. It merely furnishes a means for a complainant to reach a second corporation or individual upon a cause of action that otherwise would have existed only against the first corporation. An attempt to pierce the corporate veil is a means of imposing liability on an underlying cause of action such as a tort or breach of contract. It has been said that the alter ego doctrine is thus remedial, not defensive, in nature. One who seeks to disregard the corporate veil must show that the corporate form has been abused to the injury of a third party. [1 Fletcher, Cycopledia Corporations, § 41.10.]

We conclude that plaintiffs did not establish that Sealtex was the alter ego of SCM. SCM is a limited liability company with two members, the Koning brothers. Sealtex is a Michigan corporation with three shareholders, the Koning brothers and Michael Pitcher. Plaintiffs did not show that SCM controlled, or otherwise had a legal relationship with, Sealtex. Thus, there is no legal relationship between Sealtex and SCM that could be pierced. See *Gledhill v. Fisher & Co.,* 272 Mich. 353, 357-358, 262 N.W.2d 371 (1935).

**[14]** We also agree with defendants that Sealtex was not used by SCM to commit a fraud and that the trial court did not find that Sealtex was used by anyone to commit a fraud or other wrong, but rather found that SCM's creation was to avoid debts owed to plaintiffs. Defendants assert that the trial court got it backwards, i.e., if the court was going to find that Sealtex was the alter ego of SCM, as it purported to do, then it needed to find that Sealtex was used by SCM to commit a fraud or wrong, which would then justify piercing Sealtex's corporate veil and attaching liability to SCM. We agree that the court did not so find. Finally, defendants assert that because plaintiffs were unsecured creditors of an insolvent corporation (Sealtex/ST1), even if SCM had used Sealtex to commit a fraud, plaintiffs did not suffer any unjust loss as a result. We agree that plaintiffs' loss was caused by Sealtex's economic collapse, not because of a relationship between SCM and Sealtex.

**[15]** Defendants assert that the trial court erred by piercing of the corporate veil of SCM and holding defendants Koning personally liable for SCM's obligations. We agree. "An appellate court's review of a decision not to pierce the corporate veil is de novo because of the equitable nature of the remedy." *Foodland Distributors v. Al-Naimi,* 220 Mich.App. 453, 456, 559 N.W.2d 379 (1996).

> As a general proposition, the law treats a corporation as an entirely separate entity from its stockholders, even where one person owns all the corporation's stock. This fiction is a convenience, introduced to serve the ends of justice. However, when this fiction is invoked to subvert justice, it may be ignored by the courts. The traditional basis for piercing the corporate veil has been to protect a corporation's creditors where there is unity of interest of the stockholders and the corporation and where the stockholders have used the corporate structure in an attempt to avoid legal obligations.

> **\*13** There is no single rule delineating when the corporate entity may be disregarded .... this Court has upheld the following standard for piercing the corporate veil:

>> First, the corporate entity must be a mere instrumentality of another entity or individual. Second, the corporate entity must be used to commit a fraud or wrong. Third, there must have been an unjust loss or injury to the plaintiff.

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works. 13

[*Id.* at 456-457, 559 N.W.2d 379 (internal quotes and citations omitted).]

**[16]** Because plaintiffs do not cite authority in support of the trial court's ruling to pierce SCM's corporate veil, [8] we deem this issue abandoned. *In re Application of Ind Mich. Power Co., supra.* Even if the issue were preserved, regarding plaintiffs Pitcher, we note that defendants correctly argue that their claims against SCM were resolved before trial at case evaluation, the case evaluation panel valued plaintiffs' claims at zero, and plaintiffs accepted that valuation and a judgment of no cause of action was entered in SCM's favor. Thus, SCM has no liability to the Pitcher plaintiffs, and the trial court improperly entered judgment against Larry and David Koning on the Pitchers' piercing the corporate veil count. Further, plaintiffs did not show that SCM was the mere instrumentality of the Koning brothers. SCM was formed in July 2003, in compliance with Michigan law and maintained its own books and records, separate from the Koning brothers' finances. SCM filed tax returns in 2003 and 2004. Nor was SCM used to commit a fraud; SCM bought Sealtex's assets at an Article 9 sale and, as the trial court found, bought them for fair value. Nor did plaintiffs suffer an unjust loss or injury as a result of SCM buying Sealtex's assets because Sealtex's assets were worth less than Sealtex's secured debt. Although Sealtex never paid plaintiffs, that was not a result of the Article 9 sale; it was a result of Sealtex's economic failure and plaintiffs' unsecured creditor status.

For these reasons, we reverse the trial court's judgments against the Koning brothers and against SCM. [9]

*Docket No. 275931*

**[17]** Plaintiff DeWitt asserts that the trial court should have denied LS Mold's claims for offer of judgment sanctions because this case triggered the interest of justice exception, MCR 2.405(D)(3), because it is a case affecting the public interest, because of misconduct by the prevailing party, because the offer of judgment was pure gamesmanship, and because this case involved an issue of unsettled law concerning successor liability. Plaintiff maintains that the misconduct is evident in that all four defendants' attorney fees and costs were billed only to LS Mold.

We review a trial court's award of attorney fees under MCR 2.405 for an abuse of discretion. *JC Bldg. Corp. II v. Parkhurst Homes, Inc.,* 217 Mich.App. 421, 426, 552 N.W.2d 466 (1996). MCR 2.405(D)(1) provides that

> If the adjusted verdict is more favorable to the offeror than the average offer [10], the offeree must pay the offeror's actual costs incurred in the prosecution or defense of the action.

**\*14** The interest of justice exception of MCR 2.405(D)(3) provides:

> The court shall determine the actual costs incurred. The court may, in the interest of justice, refuse to award an attorney fee under this rule.

Regarding the interest of justice exception, this Court has noted that it should be applied only in unusual circumstances, and that the unsettled nature of the law was such a circumstance. See *Stitt v. Holland Abundant Life Fellowship (On Remand),* 243 Mich.App. 461, 472-473, 624 N.W.2d 427 (2000).

> Factors such as the reasonableness of the offeree's refusal of the offer, the party's ability to pay, and the fact that the claim was not frivolous "are too common" to constitute the unusual circumstances encompassed by the "interest of justice" exception. However, the exception may be applicable when an offer is made in the spirit of "gamesmanship, ... rather than a sincere effort at negotiation," or when litigation of the case affects the public interest, such as a case involving an issue of first impression. [*Derderian v. Genesys Health Care Systems,* 263 Mich.App. 364, 391, 689 N.W.2d 145 (2004) (internal quotes and citations omitted).]

In February 2004, the trial court ordered facilitative mediation in lieu of case evaluation, pursuant to MCR 2.411. The parties agreed on a mediator and mediation occurred on December 21, 2004. No settlement was reached. On December 23, 2004, LS Mold offered to stipulate to entry of judgment against it in the amount of $5,000 under MCR 2.405. Trial was scheduled for March 16, 2005. Plaintiff filed his motion to submit the case-to-case evaluation on December 29, 2004. The trial court noted at the January 10, 2005, motion hearing that

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works. 14

plaintiff had not yet responded to defendant's offer of judgment with a counter-offer and had three or so days left to do so. The trial court denied the motion.

Plaintiff counter-offered to stipulate to entry of judgment in his favor for $200,000 on January 12, 2005. LS Mold rejected this offer. Therefore, the average offer was $102,500. The trial court's entry of judgment of no cause of action in LS Mold's favor on plaintiff's claims is more favorable to LS Mold than the average offer. Thus, plaintiff was required to pay LS Mold's actual costs from the date plaintiff failed to stipulate to LS Mold's offer of judgment, subject to the interest of justice exception of MCR 2.405(D)(3).

We agree with plaintiff that his claims against LS Mold involved unsettled case law concerning successor liability. See discussion of *Starks, supra.* Before *Starks,* the Supreme Court had not extended or applied the successor liability doctrine to cases outside the products liability context. In *Craig,* decided before *Starks,* the Supreme Court declined to extend *Turner* to the medical malpractice context. However, this Court on various occasions had considered successor liability claims outside the products liability context. See e.g., *Zantel Marketing Agency v. Whitesell Corp.,* 265 Mich.App. 559, 696 N.W.2d 735 (2005), in which the plaintiff, a sales agent for a corporate manufacturer, brought suit against the buyer of the manufacturer's assets to recover commissions and breach of contract damages. On the successor liability question, in *Antiphon, Inc. v. LEP Transport, Inc.,* 183 Mich.App. 377, 454 N.W.2d 222 (1990), this Court reviewed the asset agreement to determine whether the buyer assumed liability, held that the asset agreement unambiguously provided that the buyer did not assume the liability for the 1997 agency agreement between the plaintiff and the seller corporate manufacturer, and reversed the trial court's denial of the defendants' motions for a directed verdict.

**\*15** Plaintiff also asserts that all attorney fees and costs were billed only to LS Mold and that this was misconduct such that the interest of justice exception should be invoked. The trial court reduced the fees LS Mold requested by 20%, noting the Koning brothers' questionable conduct, and stating that allowing them to recover full attorney fees through the LS Mold motion would be unjust.

Under the unique circumstances presented here, including that all defendants' legal fees were charged to LS Mold, and the fact that the state of the law regarding successor liability was unsettled, we conclude that the trial court's 20% reduction of the requested attorney fees is insufficient. We thus remand to the trial court for further reduction, or elimination altogether, of offer of judgment sanctions awarded to LS Mold, apart from those for defendants' expert, Professor Spoon.

**[18]** Plaintiff asserts that the trial court abused its discretion by awarding LS Mold 80% of the costs for Professor Spoon. We disagree. Plaintiff reiterates his argument that the trial court allowed Professor Spoon to testify beyond the scope of the court order. We rejected this argument, *supra.*

LS Mold's motion for offer of judgment sanctions sought $14,850.00 in costs for Professor Spoon. Plaintiff objected that the cost should have been borne by the other defendants. The trial court reduced LS Mold's requested fees by 20% and noted the difficulty that apportionment between the different defendants would pose. Plaintiff has not shown that Professor Spoon's testimony was improperly admitted or that his testimony was inapplicable to LS Mold's defense. Spoon testified regarding successor liability and alter ego, in response to plaintiff's fifth amended complaint's assertion of both those claims against LS Mold. We conclude that the trial court did not abuse its discretion.

We reject plaintiff DeWitt's argument that the trial court abused its discretion by failing to reduce the attorney fees sought by LS Mold for Varnum's defense of the Koning brothers in the consolidated case of plaintiffs Pitcher, because LS Mold did not defend against the Pitchers-a judgment of no cause of action had entered in favor of LS Mold in the Pitcher case. Thus, the trial court properly rejected plaintiff's argument that LS Mold's attorney fees should be reduced accordingly.

Finally, plaintiff DeWitt asserts that Varnum is not entitled to collect any fees for representing any party in this case due to the firm's conflicts of interest in representing adverse parties, i.e., Sealtex Company, SCM, LS Mold, and all the individual Konings. [11]

The nub of plaintiff's argument is that before Sealtex and LS Mold executed the surrender agreement on September

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works. 15

10, 2003 (whereby Sealtex surrendered all its assets to LS Mold), [12] Varnum improperly represented both entities. Plaintiff cites ¶ 6 of the surrender agreement, which states that Sealtex waived certain rights "after consultation with counsel." Plaintiff notes that Varnum attorney Donovan testified that he represented LS Mold, and not Sealtex, but when asked who represented Sealtex he answered he did not know. Plaintiff argues that only Varnum could have advised Sealtex.

**\*16** The rights Sealtex waived pursuant to the surrender agreement, "after consultation with counsel," were of notice under the UCC of the sale of collateral, i.e., "any notification requirements set forth in Article 9 of the Uniform Commercial Code as enacted in Michigan. Specifically, the notification requirements set forth in 9-612 and 9-613 [13] are hereby knowingly, voluntarily and after consultation with counsel, waived."

We agree with plaintiff that Varnum attorney Donovan's testimony raises questions, and we believe this issue should be addressed on remand. Nonetheless, the record before us permits only the conclusion that Varnum did not formally represent Sealtex in *this litigation;* Varnum did not file an appearance or answer the complaint on Sealtex's behalf, and a default judgment was entered against Sealtex. In any event, we need not address this issue further given our disposition to remand to the trial court for further reduction or elimination of offer of judgment sanctions to LS Mold.

We affirm in Docket No. 273387. In Docket Nos. 273390 and 274255, we vacate the judgments entered in plaintiffs' favor. In Docket No. 275931, we affirm the award of costs for defendants' expert, but otherwise vacate the award of offer of judgment sanctions, and remand for further reduction under the interest of justice exception. We do not retain jurisdiction.

**All Citations**

Not Reported in N.W.2d, 2008 WL 2312668

Footnotes

1   The trial court held in pertinent part:

The legal framework in Michigan is established in the court's August 30, 2005, opinion resolving a summary disposition question:

The rule is that asset purchasers do not acquire the seller's liabilities. There are at least five exceptions, well stated in *Foster v. Cone-Blanchard Machine Co.,* 460 Mich. 696, 702, 597 N.W.2d 506 (1999).

After that ringing pronouncement, things here get succeedingly muddier.... (Summary disposition analysis omitted.) *Turner v. Bituminous Casual Co.,* 397 Mich. 406, 244 N.W.2d 873 (1976) carved out an exception, limited to products liability cases, from the rule that the successor corporation did not succeed to the debts of its predecessor. The Michigan Supreme Court, most recently in *Craig v. Oakwood Hosp.,* 471 Mich. 67, 684 N.W.2d 296 (2004), has affirmed clearly that it considers the *Turner-Foster* requirements to apply only to products liability cases.

The *Craig* analysis, though, is puzzling. After analyzing the case on its merits, and deciding that the plaintiff was not entitled to a recovery against any successor corporation (*Craig* at 95-98, 684 N.W.2d 296), the court simply concluded, then, that it had never applied successor liability in the medical malpractice context, and that the policies that justified imposition of successor liability were noticeably inapplicable to that situation. Logically, defendants Koning, *et al.,* are correct when they say that, as a matter of policy, a commercial claim should not be allowed here, if a medical malpractice claim is most assuredly not allowed under the *Turner* exception. However, that raises the question which troubles this judge-if that indeed is the reasoning for the *Craig* majority's opinion, why, then, go into all the factual analysis that it did? Is the reasoning then, on pages 98-99, which follows the word "moreover ..." simply dicta?

Plaintiff's cases, *Shue & Voeks, Inc. v. Amenity Design and Mfg., Inc.,* 203 Mich.App. 124, 511 N.W.2d 700, *Zantel Marketing Agency v. Whitecell Corporation,* 265 Mich.App 599, 796 NW2d 735 (2004), and *Antiphon v. LEP Transport,* 183 Mich.App. 377, 454 N.W.2d 222 (1990), suggest that, even while plaintiff was in the process of losing the case because the facts did not support the theory, recovery will lie against successor corporations for theories other than products liability. The venerable case of *Chase v. Michigan Tell Co.,* 121 Mich. 631, 80 N.W. 717 (1899) also allowed a successor liability theory to proceed in a claim asserting a personal injury.

These Court of Appeals cases seem to have survived *Foster-Cone, Turner,* and *Craig.* The Michigan Supreme Court, in *Craig,* had every opportunity to resoundingly overrule them, and declined to do so. The only conclusion left to

this court is that claims for things other than products liability remain viable against the successor corporation, when otherwise properly presented.

This remains the court's analysis, with the addition that the current Michigan Supreme Court is not shy about overruling precedent it determines was wrongly decided.

The problem is that none of the cases noted above is based on an Article 9 analysis. Reliance on Article 9 helps, to some degree, because there is much parallel, if not necessarily binding, precedent which can assist.

[discussion of North Carolina, New Jersey cases]

Applying all these principles to the instant case, LSM is not a successor corporation to ST1; A finding of successor liability for the foreclosing entity would have detrimental and unintended policy ramifications.

In *Starks,* unpublished opinion per curiam of the Court of Appeals, issued November 29, 2005 (Docket No. 257127), the plaintiff brought suit seeking to collect a judgment from the defendants on theories of successor liability, conversion, fraud and piercing the corporate veil. A panel of this Court concluded that the plaintiff failed to present any evidence that the sale of the predecessor's assets, specifically its goodwill, was fraudulent, in bad faith or lacking in consideration; and failed to present evidence that the successor assumed the predecessor's liabilities. The panel also concluded that the remaining *Turner* factors did "not support the imposition of successor liability."

Defendants are correct that "a plaintiff in a § 541 a action is a corporation suing for breach of a duty to the corporation or a shareholder suing derivatively suing on behalf of the corporation," *Estes v. Idea Engineering & Fabricating, Inc.,* 250 Mich.App. 270, 285, 649 N.W.2d 84 (2002), and that plaintiffs are neither.

Section 541 a provides in pertinent part:

(1) A director or officer shall discharge his or her duties as a director or officer ... in the following manner:

(a) In good faith.

(b) With the care an ordinarily prudent person in a like position would exercise under similar circumstances.

(c) In a manner he or she reasonably believes to be *in the best interests of the corporation.*

(2) In discharging his or her duties, a director or officer is entitled to rely on information, opinions, reports, or statements, including financial statements and other financial data, if prepared or presented by any of the following:

(b) Legal counsel, public accountants ... or other persons as to matters the director or officer reasonably believes are within the person's professional or expert competence.

[MCL 450.1541a (emphasis added).]

Regarding this enlargement of a trustee's rights, the Court noted that the trustee now:

had the right to pursue property transferred by the bankrupt in fraud of his creditors, a right not possessed by the bankrupt, and he also had the rights of a creditor "armed with process"-all the rights of a judgment creditor holding an execution duly returned unsatisfied; in other words he had all the rights of a creditor who had taken all the steps preliminary to filing a creditor's bill....

That *a creditor* of a corporation *whose claim has been reduced to judgment upon which execution has been issued and returned nulla bona may file a creditors' bill,* if the facts justify it, is beyond question in this State. *Turnbull v. Lumber Co.,* 55 Mich. 387 (21 N.W. 375); 3 Comp. Laws 1915 §§ 12302, 13580 *et seq.* The trustee in bankruptcy now having the same rights as such a creditor may also file a creditors' bill in the courts of this State. This is a right given the trustee by the amendment, and it should not be taken from him by the argument pressed upon us that creditors may pursue such remedy. If the argument of counsel is sound and the trustee may not file a creditors' bill, in a great majority of cases there would be no remedy, because neither could the creditor. *Rarely have creditors before adjudication of bankruptcy proceeded to judgments and had executions issued and returned unsatisfied, a necessary preliminary to filing of a creditors' bill.* [citations omitted] If a suit was pending and undisposed of, it would be stayed by operation of the bankruptcy law ... and after the discharge of the bankrupt he could not be sued for a debt which his discharge released him from. Such a right as appellants insist creditors possess would be but a naked right without a remedy....

The fact that all creditors do not participate in the fund does not prevent the trustee from reducing the fund to his possession for the benefit of those entitled to share in it. [*Grand Rapids Trust Co., supra* at 132-134, 165 N.W. 667 (Emphases added).]

Citing *Turnbull, supra;* 3 Comp Laws 1915 §§ 12302, 13580 *et seq.*

Plaintiffs assert that SCM (Sealtex 2) filed bankruptcy on October 6, 2006, an automatic stay was issued in the bankruptcy court, and that the maintenance of this appeal on its behalf violates the automatic stay. We disagree. The Koning brothers are solvent co-defendants of SCM/ST2. "In the absence of unusual circumstances, the automatic stay does not halt proceedings against solvent co-defendants [of the debtor]." *In re Delta Airlines, Inc.,* 310 F.3d 953, 956 (C.A.6 2002).

15-41307-mlo   Doc 479-1   Filed 05/05/17   Entered 05/05/17 14:25:39   Page 18 of 19

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works. 17

The cases plaintiffs cite do not involve solvent co-defendants. We conclude that plaintiffs' argument that the automatic stay bars defendants' argument fails.

The only case plaintiffs cite under this issue, *Nogueras v. Maisel & Assoc. of Michigan,* 142 Mich.App. 71, 86, 369 N.W.2d 492 (1985), is to support the general proposition that there are three requisites to piercing the corporate veil.

Given our disposition, we do not address defendants' argument that the trial court's factual finding that the value of Sealtex's assets did not exceed the amount of Sealtex's secured debt and its holding that plaintiffs suffered no damages preclude any possible liability or damages in plaintiffs' favor.

"Average offer" is defined as the "sum of an offer and a counteroffer, divided by two." MCR 2.405(A)(3).

Without citation to authority, defendants argue that plaintiff waived any right to assert a conflict of interest because he did not file a motion below or seek to disqualify Varnum at any point during the litigation or trial and only raised the issue when defendants moved post-trial for offer of judgment sanctions. We disagree. See *In re Paine,* 14 B.R. 272 (W.D.Mich.1981); *In re Estate of Watson,* 5 Neb.App. 184, 557 N.W.2d 38 (1996).

Plaintiff filed his complaint against Sealtex on August 25, 2003, and amended his complaint to add LS Mold as a defendant on September 29, 2003.

MCL 440.9612 and 440.9613 provide:

Sec. 9612. (1) Except as otherwise provided in subsection (2), whether a notification is sent within a reasonable time is a question of fact.

(2) In a transaction other than a consumer transaction, a notification of disposition sent after default and 10 days or more before the earliest time of disposition set forth in the notification is sent within a reasonable time before the disposition.

Sec. 9613. Except in a consumer-goods transaction, the following rules apply:

(a) The contents of a notification of disposition are sufficient if the notification does all of the following:

(i) Describes the debtor and the secured party.

(ii) Describes the collateral that is the subject of the intended disposition.

(iii) States the method of intended disposition.

(iv) States that the debtor is entitled to an accounting of the unpaid indebtedness and states the charge, if any, for an accounting.

(v) States the time and place of a public disposition or the time after which any other disposition is to be made.

(b) Whether the contents of a notification that lacks any of the information specified in subdivision (a) are nevertheless sufficient is a question of fact.

(c) The contents of a notification providing substantially the information specified in subdivision (a) are sufficient, even if the notification includes information not specified by that paragraph or minor errors that are not seriously misleading.

(d) A particular phrasing of the notification is not required.

**End of Document**                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW  © 2017 Thomson Reuters. No claim to original U.S. Government Works.                    18